UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VANESSA ADAMS,　　　　　　　　　　　　　18-CV-00899-MJR
　　　　　　　　　　　　　　　　　　　　　　DECISION AND ORDER
　　　　　　Plaintiff,

　　-v-

ANDREW SAUL,
Commissioner of Social Security,[1]

　　　　　　Defendant.
_____

　　　　Pursuant to 28 U.S.C. §636(c), the parties consented to have a United States Magistrate Judge conduct all proceedings in this case. (Dkt. No. 14)

　　　　Plaintiff Vanessa Adams ("plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying her Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, plaintiff's motion (Dkt. No. 10) is denied and defendant's motion (Dkt. No. 12) is granted.

## BACKGROUND

　　　　Plaintiff filed an application for SSI on May 14, 2014 alleging disability since August 1, 2013 due to injuries from an automobile accident, anxiety, and depression. (*See* Tr. 165, 182)[2] Plaintiff's application was initially denied on September 4, 2014. (Tr. 15)

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).
[2] References to "Tr." are to the administrative record in this case.

1

Plaintiff filed a written request for a hearing on October 22, 2014. (Tr. 106-08) A hearing was held before Administrative Law Judge ("ALJ") Bryce Baird on March 9, 2017. (Tr. 15, 33-69) Plaintiff, who was represented by counsel, testified at the hearing. (*Id.*) ALJ Baird also received testimony from Vocational Examiner ("VE") Rachel Duchon. (*Id.*) On July 21, 2017, ALJ Baird issued a decision finding that plaintiff's condition did not meet the standard for disability as defined by the Act since May 14, 2014, the date her application was filed. (Tr. 15-25) The Appeals Council denied plaintiff's request for review of ALJ Baird's determination on June 13, 2018, and this action followed. (Tr. 1-3)

Born on January 26, 1990, plaintiff was twenty-four years old when she filed for SSI and twenty-seven years old on the date of the hearing. (Tr. 165, 178) She attended special education classes through the 10th grade and has a past work history of babysitting and "doing hair". (Tr. 40)

## **DISCUSSION**

I.  *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the

Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (*quoting Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II. <u>*Standards for Determining "Disability" Under the Act*</u>

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.* Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.* Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second,

4

whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §404.1545(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* §404.1520(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* Finally, if the claimant cannot perform his or her past relevant work or does not have any past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act. *Id.*

The burden through steps one through four described above rests on the claimant. If the claimant carries their burden through the first four steps, "the burden then shifts to

5

the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll*, 705 F.2d at 642.

   III.   *The ALJ's Decision*

The ALJ followed the required five-step analysis for evaluating plaintiff's claim. Under step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the application date of May 14, 2014.[3] (Tr. 17) At step two, the ALJ found that plaintiff has the severe impairments of degenerative disc disease of the lumbar spine, depression and anxiety.[4] (Tr. 17-18) At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 18-19) Before proceeding to step four, the ALJ assessed plaintiff's RFC as follows:

> [T]he [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(a) except she can lift and carry up to 20 pounds on occasion, and up to 10 pounds frequently. She can sit up to 6 hours in an 8-hour workday, and stand/or walk up to 6 hours in an 8-hour workday. She can occasionally climb ramps and stairs, but cannot climb ropes or scaffolds. She can occasionally stoop, kneel, and crouch. She cannot crawl. [Plaintiff] could perform simple routine tasks that can be learned after a short demonstration or within 30 days. She cannot perform jobs that

---

[3] Plaintiff testified that after the alleged onset date, she was babysitting or "doing hair" approximately four to six hours a week or month. (Tr. 17) However, plaintiff could not recall how much money she earned and her earning records show no earnings since the alleged onset date. (*Id.*) The ALJ noted that in order to reach a definitive conclusion as to whether plaintiff was engaged in substantial gainful activity at any time after the alleged onset date, further evidence would need to be obtained. (*Id.*) However, since the ALJ went on to conclude that since plaintiff is capable of performing other work that exists in significant numbers in the national economy and her claim should be denied at step five of the sequential evaluation process, he would give plaintiff the benefit of the doubt that she did not engage in substantial activity at any time subsequent to the alleged onset date. (*Id.*)

[4] The ALJ noted that plaintiff had a history of marijuana use that ended in March 2008 and that her urine toxicology was positive for cocaine in December 2013. (Tr. 17) Further, plaintiff was prescribed a number of pain medications for her back pain including Lortab, Oxycodone and Fentanyl. (*Id.*) However, there was evidence in her medical records to suggest that plaintiff was selling these medications instead of using them. (*Id.* at 18) For this reason, the ALJ gave plaintiff the benefit of the doubt that she was in remission from marijuana abuse since 2008 and did not have a severe substance abuse disorder that caused more than minimal limitations since the alleged onset date. (*Id.*) The ALJ also noted that while plaintiff complained of neck and shoulder injuries, the treatment notes revealed no complaints, abnormal clinical or diagnostic findings, and no treatment for these impairments since August 2014. (*Id.*) Thus, he found her neck and shoulder complaints to be non-severe. (*Id.*)

would not require driving a vehicle or travel to unfamiliar places.[5] [Plaintiff] can have no more than occasional interaction with co-workers and no more than superficial interaction with the public. She cannot perform teamwork, such as work on a production line.

(Tr. 367)

Proceeding to step four, the ALJ concluded that plaintiff has no past relevant work. (Tr. 24) Specifically, plaintiff's only work in the past 15 years was babysitting and "doing hair", which she performed on a part-time basis. (*Id.*) These jobs do not meet the criteria of Social Security Regulations 82-62 and therefore are not vocationally relevant. (*Id.*) The ALJ went on to find that based upon plaintiff's age, education, work experience, RFC and the testimony of the VE, there are jobs which exist in significant numbers in the national economy which plaintiff can perform, such as garnisher, folder, and box inspector. (Tr. 24-25) Thus, the ALJ ultimately concluded that plaintiff has not been under a disability, as defined by the Act, since May 14, 2014, the date the application for SSI was filed.

    IV. *Plaintiff's Challenges*

Plaintiff argues that the ALJ improperly relied on his own lay opinion to fashion an RFC finding not supported by the evidence. (*See* Dkt. No. 10-1 (Plaintiff's Memo. of Law)). The Court disagrees and finds, for the following reasons, that the RFC is supported by substantial evidence.

An individual's RFC is "what an individual can do despite his or her limitations" or her "maximum remaining ability to do sustained work activities in an ordinary work setting

---

[5] Based on the record as whole, the Court concludes that this sentence contains a typographical error and that the ALJ intended it to read: "She cannot perform jobs that would require driving a vehicle or travel to unfamiliar places." During the hearing, the hypothetical proposed by the ALJ to the VE included an individual who would be "limited to jobs that do not require driving a vehicle; and would not require travel to unfamiliar places." (Tr. 63)

on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999); *quoting* SSR 96-8p, 1996 SSR LEXIS 5 at *5, 1996 WL 374184, *2 (July 2, 1996). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (NDNY 2009); *accord* 20 CFR §404.1545(a). Further, "an ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." 20 CFR §404.1545(b)-(e). Here, the Court finds that the ALJ properly considered all relevant evidence of plaintiff's physical and mental impairments in fashioning an appropriate RFC that is supported by substantial evidence in the record.

<u>Plaintiff's Physical Impairments</u>

At the hearing, plaintiff testified that the primary reason she is unable to work is back pain as a result of a car accident on December 8, 2011.[6] (Tr. 44) However, the ALJ explained in detail how plaintiff's treatment records for back pain did not support her contention that she was totally disabled from work. (Tr. 21-22)

Plaintiff treated with an orthopedic surgeon, Dr. Cameron Huckell, immediately following the car accident. (Tr. 265-67) On December 30, 2011, x-rays of her lumbar spine were normal and she was diagnosed with a left spine sprain or strain as a result of the accident. (Tr. 267) An MRI of plaintiff's lumbar spine on January 3, 2012 showed normal disc space height, normal signal intensity and minimal disc bulging. (Tr. 271) On

---

[6] During the hearing, plaintiff testified that the car accident occurred in November of 2012. However, the record reflects the accident took place on December 8, 2011. (Tr. 21, 229) Plaintiff was unemployed at the time of the car accident. (Tr. 266)

8

January 31, 2012, Dr. Huckell opined that plaintiff's symptoms should resolve with time and conservative measures, such as chiropractic treatment, and that no surgical intervention was needed. (*Id.*) On May 31, 2012, Dr. Huckell noted that plaintiff's "pathology [was] extremely mild" and recommended epidural injections, physical therapy and continued pain management. (Tr. 279)

Plaintiff received primary care at UBMD Family Medicine at Jefferson ("UBMD") from April 2013 through August 2014. (Tr. 305-405) As noted by the ALJ, plaintiff's physical examinations during this time were unremarkable and did not reflect a disabling back condition. (Tr. 21) Specifically, she was repeatedly found to have either a normal or sometimes slow or abnormal gait, full range of motion of the neck, normal motor and extremity strength and occasional back tenderness. (Tr. 401, 395-97, 391-93, 387-89, 374-77, 366) An x-ray of plaintiff's spine on May 29, 2013 showed no acute pathology. (Tr. 391) Also during this time period, plaintiff's treating physicians repeatedly noted that her pain and physical examinations were "out of proportion" to the radiographic findings. (Tr. 22, 385-86, 361, 358) For example, on January 21, 2014, plaintiff visited UBMD complaining of extreme back tenderness and indicating that she had used all of her prescription pain medication patches weeks early. (Tr. 354) The examining physician noted that plaintiff exhibited no appreciable tenderness when distracted and that even though plaintiff reported she could not sit-up straight due to back pain, she had no difficulty ambulating to the bathroom and did not appear to be in pain. (Tr. 356) On March 14, 2014, plaintiff was found to have a normal gait, normal upper and lower extremity findings, and equal motor strength. (Tr. 351) An examination on July 22, 2014 revealed a normal

9

gait, back tenderness, full motor strength of the lower extremities, normal sensation and normal reflexes. (Tr. 332)

In addition to noting the lack of objective medical evidence suggesting a disabling back condition, the ALJ also cited plaintiff's ongoing issues with prescription pain medication. (Tr. 18) Beginning in April 2013, plaintiff was prescribed narcotic pain medication by UBMD for her back pain, including Lortab, Oxycodone, and Fentanyl. (Tr. 18, 393, 389, 386, 381) In August of 2013, plaintiff was warned that she would not be prescribed long-term pain medication and should continue physical therapy. (Tr. 381) During a visit on November 8, 2013, plaintiff indicated that she again used all of the Fentanyl early because the patches which administered the medication would fall off her body after two days. (Tr. 368) The doctor wrote an early prescription refill but warned that UBMD would not continue to do so. (Tr. 370) During a visit on December 18, 2013, plaintiff stated that she had been out of Fentanyl since December 2, despite the fact that she received a prescription for a 30-day supply of the medication on November 8. (Tr. 365) That same day, plaintiff's urine toxicology test was positive for cocaine. (Tr. 367) During a visit to UBMD on January 21, 2014, the examining physician declined to prescribe plaintiff more narcotic medication for pain, explaining she had prescribed an entire month's supply of Fentanyl about two weeks prior. (Tr. 358-60) Four days after plaintiff was denied an early refill of Fentanyl by a UBMD doctor, she visited the emergency room at Erie County Medical Center ("ECMC") complaining of back pain and received a prescription for Hydrocodone. (Tr. 451) During visits to UBMD on February 21 and May 12, 2014, plaintiff again indicated that she used all of the Fentanyl patches weeks early. (Tr. 354, 340) However, plaintiff's urine screens were negative for Fentanyl

and she was warned that UBMD would no longer prescribe the drug if this continued to occur. (Tr. 343) On June 4, 2014, plaintiff again stated that she was continuing to "run out" of Fentanyl patches early because they kept falling off and she could not afford tape to keep them in place. (Tr. 335) The treating physician noted that 10 out of 12 Fentanyl tests in the past year had been negative and that UBMD would no longer prescribe Fentanyl as it was "very hard to believe that [plaintiff] [was] using the medication." (Tr. 338) On August 11, 2014, plaintiff was again told by a UBMD treating physician that the practice could not continue to prescribe her Fentanyl because her urine screens were consistently negative for the drug despite prior warnings. (Tr. 328) Moreover, plaintiff had not followed up with neurosurgery or pain management as directed. (*Id.*) Shortly therefore, plaintiff stopped treating with UBMD.

Plaintiff did not regularly receive treatment for her back condition again until almost a year later, when she reestablished primary care at Medical Care of WNY on August 17, 2015. (Tr. 414) She was diagnosed with lumbago, anxiety and obesity and was prescribed Hydrocodone for pain. (Tr. 414-15, 422, 425) As noted by the ALJ, plaintiff did not tell her treatment providers at Medical Care of WNY about her previous history with prescription pain medication. (Tr. 18) The treating nurse practitioner recommended physical therapy and ordered an MRI of plaintiff's lumbar spine. (Tr. 514) Plaintiff did not regularly attend physical therapy because of "personal issues" and problems with transportation, and she did not follow-up in receiving an MRI until December 1, 2015. (Tr. 422, 428, 432) The MRI showed a minor bulge of the annulus at L4-5 but was otherwise normal. (Tr. 435) On December 9, 2015, Medical Care of WNY received an anonymous call informing the clinic that plaintiff was selling her pain medication. (Tr. 435) Two days

11

later, plaintiff was asked to report to the clinic for a pill count. (Tr. 436) Plaintiff declined to report and stated she would be getting her prescriptions elsewhere. (*Id.*)

Plaintiff began primary care treatment at Rapha Family Medicine on July 29, 2016. (Tr. 461) She complained of back pain and right shoulder pain as a result of the car accident. (Tr. 461) After a physical examination, treating physician Dr. Frances Ilozue recorded a normal gait, normal range of motion in the neck, no tenderness of the spine, normal posture, no obvious instability of the extremities, intact motor strength, and full range of motion bilaterally. (Tr. 462) Dr. Ilozue prescribed Methocarbamol and Gabapentin for back pain and referred plaintiff to a chiropractor. (Tr. 462) Plaintiff saw Dr. Ilouze on September 21, 2016 and complained that her back pain had increased over the last three days. (Tr. 459) She had not seen a chiropractor as recommended. (*Id.*) She was found to have a slow gait, some tenderness and swelling, no obvious instability of the lower extremities, intact motor strength, and full range of motion bilaterally. (Tr. 459-90) Plaintiff visited the ECMC emergency room on March 17, 2017 due to cold symptoms. (Tr. 453) The examining doctor recorded normal range of motion, no tenderness of the neck, a normal back inspection, a normal inspection of extremities with normal range of motion, and a normal gait. (Tr. 455)

The medical evidence described above fully supports the ALJ's finding that plaintiff is capable of light work to include carrying up to twenty pounds occasionally and up to ten pounds frequently as well as sitting, standing or walking up to six hours in an eight-hour day. Contrary to plaintiff's contentions, all of the objective medical evidence indicates that plaintiff had no more than minor physical impairments. Plaintiff's physical examinations both before and after the alleged onset date showed occasional back

12

tenderness and a sometimes slow or abnormal gait, but were otherwise normal. Medical imaging of her spine and back was also consistently unremarkable. Plaintiff's representations to both her doctors and the Commissioner that she suffered from disabling back pain are plainly unsupported by the record. Her treating physicians repeatedly noted that plaintiff's complaints of pain were out of proportion to the radiographic findings. Her urinalysis was consistently negative for Fentanyl and there was evidence that she may have been selling her prescription narcotics. During the relevant time period, she stopped treating with UBMD shorty after they stopped prescribing her narcotics pain medication and she did not seek regular treatment again until one year later. Plaintiff stopped seeing her next primary care provider when she was asked to appear for a pill count. Further, she did not follow up with chiropractic care, physical therapy, neurosurgical evaluations and pain management consultations as directed by her treatment providers. *See Morgan v. Berryhill*, 1:15-cv-00449, 2017 U.S. Dist. LEXIS 200404, *15-16 (WDNY Dec. 5, 2017) (in assessing plaintiff's credibility, the ALJ could properly consider plaintiff's drug seeking behavior and failure to follow physician's treatment recommendation). Here, the RFC for light work with some additional restrictions including only occasional climbing of ramps and stairs, only occasional stooping, kneeling and crouching and no climbing of ropes of scaffolds, accounts for plaintiff's periodic back tenderness and sometimes slow or abnormal gait. Indeed, plaintiff can point to no objective medical evidence in the record that she is unable to meet the physical exertion requirements of the RFC. *See Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (the burden is on the plaintiff to show that she is unable to

perform the RFC as determined by the ALJ); 20 CFR § 404.1512 (plaintiff has the burden to prove that she is disabled).

*Mental Impairments*

Plaintiff also submits that she is unable to work as a result of her depression and anxiety. (Tr. 39) However, the ALJ's determination that plaintiff's mental impairments did not prevent her from performing work as defined by the RFC was supported by substantial evidence.

As noted by the ALJ, plaintiff briefly treated for depression, anxiety, social phobia and a panic disorder in April of 2013. (Tr. 22) However, the record contains no evidence that plaintiff treated with a mental health specialist from August 1, 2013, the date she alleged her disability began, through the remainder of the relevant time period. (Tr. 22-23) During visits with her primary care doctors during the relevant time period, plaintiff only sporadically complained of anxiety and consistently denied depression. (Tr. 22, 257, 368, 375, 387, 399, 387, 454-55, 462) Her treating physicians regularly found plaintiff to have appropriate mood, normal affect, fluent speech and relevant thought process. (Tr. 347, 356 363, 377) In October and November of 2015, plaintiff reported that Xanax, a prescription medication, was very effective in decreasing her anxiety. (Tr. 428, 432) Thus, the objective medical evidence supports the ALJ's conclusion that plaintiff's depression and anxiety did not cause her to be totally disabled from work. *See Diaz-Sanchez-Berryhill*, 295 F. Supp. 3d 302, 306 (WDNY 2018) (noting that the ALJ properly considered plaintiff's lack of any regular health treatment during the time period in question and that "[w]here, as here, plaintiff sought little-to-no treatment for an allegedly disabling condition, his inaction may appropriately be construed as evidence that the

condition did not pose serious limitations."); *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (lack of evidence that plaintiff sought medical attention may not preclude a finding of disability, but it does "seriously undermine" a disability claim); *Reices-Colon v. Astrue*, 523 Fed. Appx. 796, 799 (2d Cir. 2013) (substantial evidence of symptom improvement found in treatment notes showing that medication "seems to be helping" and that plaintiff was "feeling better" with treatment); *Morgan v. Comm'r of Soc. Sec.*, 1:18-CV-00884, 2019 U.S. Dist. LEXIS 206257, *19-20) (WDNY Nov. 26, 2019) (plaintiff's RFC was calculated based on substantial evidence that her anxiety and other symptoms were noticeably reduced with medication, counseling and other treatment).

During the hearing, plaintiff testified that, at times, her anxiety makes it difficult to interact with others and that she often feels people are judging her or "out to get her". (Tr. 59) She testified that since her car accident she experiences anxiety in vehicles and does not drive a car. (Tr. 41, 49-50) Plaintiff also testified that her depression can cause her to stay in the house and avoid seeing friends or family, and that being in public or in a vehicle can trigger her anxiety. (Tr. 49-50) Indeed, the record reflects that the ALJ considered this testimony and incorporated relevant restrictions in the RFC. Specifically, he found that plaintiff could not perform jobs that would require driving a vehicle or travel to unfamiliar places, could have no more than occasional interaction with co-workers, no more than superficial interaction with the public and could not perform teamwork. *See Camille v. Colvin*, 104 F. Supp. 3d 329 (WDNY 2015) (commissioner's determination upheld where ALJ, *inter alia*, "incorporated additional limitations in her RFC to

accommodate Plaintiff's social functioning, concentration and memory in accordance with plaintiff's testimony.")[7]

For all of these reasons, the Court finds that RFC is supported by substantial evidence in the record.

Plaintiff further contends that the ALJ erred because he failed to rely on any medical opinions in fashioning the RFC or conduct a function-by function analysis. (*See* Dkt. No. 10-1 (Plaintiff's Memo. of Law)). The Court rejects this argument.

The ALJ provided good reasons, in accordance with the Social Security Regulations, for assigning little weight to the medical opinions in the record. To begin, the ALJ gave little weight to Dr. Michael Calabrese's August 2012 opinion that plaintiff was "temporarily totally disabled and had marked limitation for lifting, bending, walking, sitting, and performing domestic or household duties." (Tr. 23) As noted by the ALJ, Dr. Calabrese's opinion was rendered a year prior to the alleged onset date. (*Id.*) In addition, Dr. Calabrese did not treat plaintiff during the relevant time period, and all of the subsequent medical evidence in the record, discussed in detail above, does not support the finding of a marked limitation in any of these exertional requirements. *See Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (finding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record"); *Rogers v. Astrue*, 895 F. Supp. 2d 541, 549 (SDNY 2012) ("The treating physician rule…does not

---

[7] Plaintiff also argues that the ALJ erred in finding that she was not disabled under the Act because the VE testified that an individual who was only occasionally able to interact with supervisors would be unable to make it through the probationary period. However, the ALJ did not include such a limitation in the RFC and the Court finds, for all the reasons stated herein, that the RFC is supported by substantial evidence. Further, evidence that plaintiff had educational difficulties and an IQ in the lower limits of verbal ability and borderline in nonverbal ability was addressed in that the ALJ restricted her to "simple routine tasks that can be learned after a short demonstration or within 30 days." (Tr. 20)

technically apply when the physician was not the treating physician at all during the relevant period"); *Mill v. Astrue*, 5:11-CV-955, 2012 U.S. Dist. LEXIS 180644 (NDNY Dec. 21, 2012) (medical records which predate the alleged onset date may be relevant *provided* there is evidence that the symptoms extended in duration into the relevant period). Similarly, the ALJ was within his purview to reject the opinion of consultative examiner Dr. Samuel Balderman, which was rendered more than a year prior to the disability onset date and based on one examination. *See Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013) (cautioning ALJ's not to rely heavily on the findings of a consultative physician after a single examination).

The ALJ also supplied good reasons for his treatment of medical opinions in the record regarding plaintiff's mental impairments. In April of 2013, Tyra Gordon, Licensed Clinical Social Worker and plaintiff's treating therapist, found that plaintiff had a Global Assessment of Functioning ("GAF") of 50. (Tr. 237-38) Pursuant to the Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 41-50 suggests serious impairment in social, occupational or school functioning. (Tr. 23) In giving the score little weight here, the ALJ correctly noted that the score was entered before the alleged onset date and that GAF scores are "only a snapshot opinion about the level of functioning used by medical professions to develop the clinical picture" and are not intended for an assessment of disability. *See Tilles v. Comm'r of Soc. Sec.*, 13-CV-06743, 2015 U.S. Dist. LEXIS 43166, *84-85 (Feb. 4, 2015) ("[A] GAF score of 50 does not, *ipso facto*, direct a finding of disability, or even a restrictive assessment of one's functional capacity."); *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) ("[U]nless the GAF rating is well supported and consistent with other evidence in the file, it is entitled to little weight[.]");

17

*Camille*, 104 F. Supp. 3d at 342 ("[A]s a global reference intended to aid in treatment, a GAF score does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work."). Here, the one-time GAF score is not supported by the majority of medical evidence in the record, which reflects that plaintiff did not regularly treat for mental health impairments during the relevant time period, was found to have normal mental functioning by her treating physicians, and admitted that her anxiety was well controlled by medication. In August of 2014, a reviewing physiatrist from the Department of Health and Human Services, Dr. M. Totin, found evidence in the record that plaintiff suffered from a severe affective disorder. (Tr. 80-81) Dr. Totin went on the conclude that the evidence before him was insufficient to establish disability or determine plaintiff's level of functioning. (*Id.*) The ALJ mistakenly indicted that Dr. Totin found insufficient evidence to establish the presence of a medically determinable severe impairment. (Tr. 23) However, because the ALJ went on to find, at step two, that plaintiff did suffer from the serve impairments of depression and anxiety, and incorporated limitations in the RFC consistent with substantial evidence in the record to address those impairments, any error on the part of the ALJ to correctly describe Dr. Totin's opinion was harmless.

Lastly, plaintiff argues that because the ALJ rejected the medical opinions in the record, he was required to conduct a function-by-function analysis or seek additional opinion evidence before fashioning the RFC.[8] As explained in detail above, all of the objective medical evidence indicates that plaintiff's mental and physical impairments were

---

[8] It is noted that while plaintiff faults the ALJ for failing to secure a function-by-function analysis, plaintiff failed to show-up to consultative examinations in connection with her disability determination on February 12, February 26, and March 13, 2013. (Tr. 175-76)

18

minor, and that the RFC is supported by substantial evidence. Where, as here, the medical records do not reflect disabling impairments, an ALJ may render a "common sense judgment" where medical evidence shows relatively minor impairments. *Gross v. Astrue*, 12-CV-6207P, 2014 WL 1806779, *18 (WDNY May 7, 2014). *See e.g.*, *Countryman v. Colvin*, 6:15-CV-06131, 2016 WL 4082730, *13 (WDNY Aug. 1, 2016) (ALJ was permitted to make common sense judgment regarding plaintiff's reaching limitation despite absence of medical opinion assessing that limitation where record showed relatively minor impairment and where "lack of . . . evidence in the record support[ed] a more restrictive limitation"); *Lay v. Colvin*, 14-CV-981S, 2016 WL 3355436, *7 (WDNY June 16, 2016) (ALJ was permitted to consider medical records and use common sense judgment to arrive "at a reasonable conclusion regarding [p]laintiff's RFC, as permitted by the [r]regulations"); *Rouse v. Colvin*, 14-CV-817, 2015 WL 7431403 at *6 (Nov. 23, 2015) (no per se error where record did not contain "recent medical opinion that specifies [p]laintiff's specific functional abilities, or evidence an RFC report was requested" where "RFC determination was based on substantial evidence because the record contained ample evidence for the ALJ to make a finding on disability, and he was not obligated to seek out additional medical opinions specific to Plaintiff's functional abilities."). For these reasons, the Court finds that the ALJ did not erroneously rely on his own lay opinions.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Dkt. No. 10) is denied and the Commissioner's motion for judgment on the pleadings (Dkt. No. 12) is granted.

The Clerk of the Court shall take all necessary steps to close the case.

**SO ORDERED.**

Dated:      March 31, 2020
               Buffalo, New York

                                       */s/ Michael J. Roemer*
                                       MICHAEL J. ROEMER
                                       United States Magistrate Judge